**DICKINSON WRIGHT PLLC**
JOEL Z. SCHWARZ (Nevada Bar No. 9181)
Email: jschwarz@dickinsonwright.com
JOANNA M. MYERS (Nevada Bar No. 12048)
Email: jmyers@dickinsonwright.com
8363 West Sunset Road, Suite 200
Las Vegas, NV 89113
Telephone: 702-550-4440
Fax: 702-382-1661

**HELLMICH LAW GROUP, PC**
CHRISTOPHER HELLMICH (application for *pro hac vice* pending)
Email: chellmich@hellmichlaw.com
5753-G E. Santa Ana Canyon Rd. #512
Anaheim Hills, CA 92807
Telephone: 949-287-5708
Fax: 714-974-7733

*Attorneys for Plaintiff U.S.A. DAWGS, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| U.S.A. DAWGS, INC.*,* a Nevada corporation, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **JURY DEMAND** |
| CROCS INC, a Delaware corporation, KIM LAWRIE, a Washington resident, ERIK RUFER, a Washington resident, and KELLY GRAY, a Colorado resident. Defendants. | |

Plaintiff U.S.A. Dawgs, Inc. ("Dawgs") for its Complaint against Defendants Crocs, Inc. ("Crocs"), Kim Lawrie, Erik Rufer, and Kelly Gray allege as follows based on its personal knowledge as for itself, and on information and belief as to the acts of others:

## I.    SUBJECT MATTER JURISDICTION

1.    Dawgs' first claim for relief arises under the Lanham Act 15 U.S.C. § 1125(a), and its third claim of relief arises under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 18



1

U.S.C. § 1030(g), 28 U.S.C. §§ 1331 and 1338.

2.    This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367, because these claims are so related to Dawgs' claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

3.    This Court also has original subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

## II.    INTRODUCTION

4.    Dawgs is a family owned and locally operated business that designs and sells footwear. Dawgs and Crocs are direct competitors in the molded footwear industry selling their products to consumers throughout the United States.

5.    Dawgs developed, manufactured, and sold a distinct Z-shaped upper for sandals that is intended to fit over the top of a wearer's foot and look like a "Z".  Dawgs has promoted and Dawgs' Z Sandals have been sold in the U.S. since 2007. After Dawgs spent several years promoting these unique sandals, building its brand, and had sold well over one million pairs in the U.S., Crocs intentionally copied Dawgs' Z Sandal, and has attempted to exploit the good reputation and commercial success of Dawgs' Z Sandal products by marketing and selling sandals with a design and appearance that is confusingly similar to Dawgs' Z Sandals (including, for example, Crocs' "Women's Swiftwater Sandal" model) in similar market channels.  In doing so, Crocs has created not only the likelihood of confusion, but actual confusion among the potential purchasers of Dawgs' Z Sandals.

6.    Unrelated to Crocs infringing upon Dawgs' trade dress rights, Dawgs recently discovered that Crocs and its employees violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, in an intentional and successful effort to deprive Dawgs of sales of its products on the popular shopping website, www.zulily.com, owned by Zulily, LLC ("Zulily").

7.    Dawgs, along with hundreds of other manufacturers and retailers including Crocs, uses Zulily's hosted website to sell its products. To enable such sales Zulily requires its



2

"vendors", such as Dawgs, to establish a private password protected Internet portal through which the vendor presents its products and its proposed prices for sales "events" Zulily intends to host on its website ("vendor portal"). Additionally, Zulily's vendor portal allows retailers to track their prior sales performance, volume of sales, and prices sold, while planning months out for future sales events. At least for Dawgs, until its products, sales prices, and the timing of the "event" are publicly posted on Zulily's website, all of the sales related information it discloses to Zulily through its vendor portal is highly confidential business information and none of Dawgs' actual sales performance is ever publicly disclosed.

8.     Emails recently produced from Zulily reveal a conversation Zulily had in November 2016 with Crocs employees in which a Crocs employee states that she was able to "get into" Dawgs' sales event before Zulily publicly posted the sales event on www.zulily.com. The Crocs employee, and her supervisors who were copied on the communication, then sought to have Zulily cancel Dawgs' sales "event", which Zulily did. Dawgs' investigation to identify the parties responsible for illegally accessing or obtaining its confidential business data leads it to reasonably conclude the only possible way Crocs could have obtained access to Dawgs' sales event was by hacking into Dawgs' private password protected vendor portal or employing some other dishonest means to unlawfully obtain Dawgs' confidential business information that was hosted only on Dawgs' vendor portal.

9.     Tellingly, the Crocs employee who touted gaining access to Dawgs' pre-sales event and computer data worked for Zulily as an ecommerce footwear buyer just before Crocs hired her away. Within the months that followed Crocs' unauthorized access of Dawgs' vendor portal and/or its computer data, Zulily steadily declined to host Dawgs sales events and this spring stopped entirely not allowing Dawgs to sell any products. Dawgs has suffered direct and substantial damages from Crocs' unauthorized access to its password protected computer data.

## III.    PARTIES

10.     Plaintiff Dawgs is a corporation organized and existing under the laws of Nevada, with its principal place of business at 4120 W. Windmill Lane, Unit 106, Las Vegas, Nevada 89139. Dawgs has had the same principal place of business since 2007.

11.     Defendant Crocs, Inc. is a Delaware corporation with its principal place of business located at 6273 Monarch Park Place, Niwot, Colorado 80503 ("Crocs"). Upon information and belief, Crocs is registered to do business in Nevada with its registered agent as: The Corporation Trust Company of Nevada, 701 S Carson Street, Suite 200, Carson City, Nevada 89701. Furthermore Crocs maintains a physical presence in Nevada through its three retail stores in Las Vegas. Plaintiff alleges claims against Crocs directly and vicariously for the actions of its employees.

12.     Defendant Kim Lawrie, upon information and belief, is a Crocs employee holding the title Key Account Manager, eComm Channel, and is a resident of Washington ("Lawrie"). Plaintiff alleges claims against Lawrie in her capacity as a Crocs employee and individually.

13.     Defendant Erik Rufer, upon information and belief, is a Crocs senior executive holding the title Wholesale Channel Director – US eComm Channel, and is a resident of Washington ("Rufer"). Upon information and belief, Lawrie reports to Rufer. Plaintiff alleges claims against Rufer in his capacity as a Crocs employee and individually

14.     Defendant Kelly Gray, upon information and belief, is a Crocs senior executive holding the title Director, Americas Corporate Sales, and is a resident of Colorado ("Gray"). Upon information and belief, Rufer reports to Gray. Plaintiff alleges claims against Gray in her capacity as a Crocs employee and individually.

15.     Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned each of the Defendants sued herein was the agent or employee of each of the remaining Defendants. Plaintiff alleges that each and every Defendant alleged herein ratified the conduct of each and every other Defendant. Plaintiff further alleges that at all times said Defendants were acting within the purpose and scope of such agency and employment. By virtue of their active, knowing conduct and participation in the conspiracies and schemes alleged, the Defendants may each be held personally liable for all of the damages caused by the conspiracies and scheme alleged herein.

## IV.   <u>VENUE</u>

16.     Venue in this district is appropriate pursuant to 28 U.S.C. § 1391, because a



1   substantial part of the events giving rise to the dispute occurred in this district, a substantial part

2   of the property that is the subject of this action was and is situated in this district, and the Court

3   has personal jurisdiction over each of the Defendants as alleged throughout this Complaint.

4   **V.      FACTUAL ALLEGATIONS**

5           **A.      BACKGROUND.**

6           17.     Dawgs and Double Diamond Distribution, Ltd. ("Double Diamond"), a

7   corporation organized under the laws of Saskatchewan, Canada and with its principal business in

8   Saskatoon, Saskatchewan, have been selling a variety of footwear in the United States since at

9   least 2006, including several different types of molded foam footwear such as sandals and clogs.

10  Dawgs and Double Diamond are separate companies with overlapping ownership. Both Dawgs

11  and Double Diamond develop and sell "Dawgs" and "Hounds" branded footwear.

12          18.     Crocs and its predecessors in interest claim to have invented a molded foam clog

13  that it began offering for sale in the United States in 2002. In 2006, Crocs began litigation

14  against all of its perceived competitors, with an intention to drive them all out of business.

15  Among others, Crocs sued Double Diamond in the United States District Court for the District of

16  Colorado, and concurrently filed a complaint against Double Diamond with the International

17  Trade Commission. The suit in the District of Colorado was assigned Case No. 1:06-cv-00605

18  ("the Colorado Action"). In 2012, Crocs filed an amended complaint in the Colorado Action and

19  added Dawgs as a defendant. Crocs' patent litigation lawsuit against Dawgs and Double

20  Diamond remains ongoing in the United States District Court for the District of Colorado.

21          **B.      TRADE DRESS.**

22          19.     Starting in 2006, Steven Mann, Dawgs' Chief Executive Officer, invented,

23  designed, and developed an innovative and unique footwear upper design. This upper design,

24  which featured straps that were shaped like the letter Z, was utilized by Dawgs on a ladies

25  sandal.

26  / / /

27  / / /

28  / / /



5

20.     Dawgs marketed this footwear as its "Z Sandal" and began promoting and selling it in the United States in 2007. One example of Dawgs' Z Sandal is pictured below:



21.     As shown above, Dawgs' Z Sandal design is a sandal that essentially encompasses two substantially parallel portions (straps) that connect to the perimeter of the sandal footbed on each side (inner and outer). One of the two substantially parallel portions is near the toe of the sandal and the other is near the middle (front to back) of the sandal. Each of the two upper portions is raised over the footbed of the sandal so as to allow a human foot to fit above the footbed while below the upper portions. A third upper portion is connected to the parallel upper portion near the toe on one side of the sandal and to the upper portion that is near the middle of the sandal on the other side of the sandal, such that it runs diagonal over the sandal footbed.

22.     Since 2007, Dawgs promoted and sold in the U.S. multiple models of its Z Sandal. Those models include Dawgs Women's Original Z Sandals, Dawgs Women's Premium Z-Sandal, Dawgs Girl's Z Sandals, Hounds Women's Z Sandals, Dawgs Women's Loudmouth Z Sandals, Dawgs Women's Mossy Oak Z Sandals, Dawgs Girl's Mossy Oak Z Sandals, and Dawgs Girl's Loudmouth Z Sandals. Each of these models features the same Z-shaped upper design (these models are collectively referred to herein as "Dawgs' Z Sandal"). All of these

1  models are sold with indications that they are sourced from Dawgs.

2    23.    Since its public release, Dawgs' Z Sandal has achieved tremendous commercial

3  success. By 2016, well over 1 million pairs of Dawgs' Z Sandals had been sold in the U.S.

4  Dawgs has sold its Z Sandal through its own retail stores, to other retailers (including in more

5  than 7,000 U.S. retail stores), on its own website, and through websites run by other entities,

6  including on website marketplaces such as amazon.com.

7    24.    In conjunction with its sales efforts, Dawgs has promoted its Z Sandal in many

8  different mediums, including the publication of thousands of promotional materials. For

9  example, Dawgs first promoted its Z Sandal on its website (www.usadawgs.com) in March 2007,

10  and has continued to do so since. In that same year, Dawgs began promoting its Z Sandal in its

11  brochures. When promoting its Z Sandal, Dawgs includes pictures of the unique Z-shaped upper.

12    25.    The design and appearance of Dawgs' Z Sandal, with its Z-shaped upper, is

13  unique and non-functional, and defines the Dawgs' Z Sandal. For example, there are hundreds if

14  not thousands of other sandals on the market that do not utilize the unique Z-shaped upper.

15  Indeed, Dawgs alone sells several other sandals that do not include this upper pattern, including

16  its 3-strap sandals and its X sandals, which include an upper shaped like the letter "X." Crocs

17  likewise sells several other sandals that do not utilize Dawgs' Z-shaped upper pattern.

18    26.    In addition, like many other entities, Dawgs manufactures and sells flip flops,

19  slides, and other footwear. From a usefulness perspective, many sandals and other alternative

20  footwear options perform the same function as Dawgs' Z Sandals while not appearing as a

21  sandal with a Z-shaped upper. It is the unique and distinct shape of the Z-shaped upper included

22  on a sandal, as pictured above, that has driven the success of Dawgs' Z Sandals, and led Dawgs

23  to be the recognizable source of its Z Sandals by both customers and retailers.

24    27.    Upon information and belief, Crocs intentionally copied the Z-shaped upper on

25  Dawgs' Z Sandals. Upon information and belief, Crocs specifically intended that its Women's

26  Swiftwater Sandal would appear to be the same as Dawgs' Z Sandals – a sandal with a Z-shaped

27  upper design – so that Crocs could capitalize on the already established popularity of Dawgs Z

28  Sandal that was invented, designed, developed, promoted, and sold for several years by Dawgs.



28.     For example, upon information and belief, prior to 2013, Crocs did not offer any sandal with a Z-shaped upper. However, in that year Dawgs both displayed its Z Sandal and provided information on the success of Dawgs' Z Sandal to Crocs during a meeting between Dawgs and Crocs to settle the Colorado Action. The meetings were held between executives for Dawgs and Crocs. As the talks progressed, a proposal was discussed whereby Crocs would acquire Dawgs. A due diligence period followed whereby Dawgs provided requested information to Crocs about Dawgs' business and product offerings.

29.     In one instance, several executives from Crocs, including Chief Executive Officer John McCarvel, Chief Product Officer Dale Bathum, Chief Operating Officer Scott Crutchfield, Vice President of Customer Experience Arezou Zarafshan, Associate General Counsel Sara Hoverstock, and others met with Dawgs' executives in Dawgs' offices located at 4120 W. Windmill Lane., Las Vegas, Nevada, on or about June 21, 2013. During those meetings, among other things, Dawgs' executives showed Dawgs' footwear offerings to Crocs' executives, including Dawgs' Z Sandals.

30.     As acquisition discussions progressed, Crocs requested Dawgs' sales numbers, and Dawgs provided product sales figures. Furthermore, Dawgs discussed with Crocs' executives that Dawgs' Z Sandals was one of Dawgs' best-selling and fastest growing products at that time. Crocs' executives, including John McCarvel, acknowledged both the success Dawgs had already had with its Z Sandal and the potential it had to become even more successful.

31.     Moreover, Crocs requested samples of certain Dawgs' footwear, including Dawgs' Z Sandals. Dawgs shipped from its offices in Las Vegas, Nevada to Crocs samples of Dawgs' Z Sandals, including in particular Dawgs' Premium Z Sandal, Hounds Z Sandal, Loudmouth Z Sandal, and Mossy Oak Z Sandal. Dawgs shipped this footwear to Crocs on August 16, 2013, to the attention of Sara Hoverstock at Crocs' offices in Niwot, Colorado.

32.     Upon information and belief, after receiving the aforementioned information from Dawgs, including the information about Dawgs' success with its Z Sandal, and after the negotiations to settle the Colorado Action concluded without an agreement, Crocs decided to use Dawgs' Z-shaped upper design on its own footwear. Upon information and belief, Crocs first



1   offered for sale a comparable sandal with a Z-shaped upper in 2017. Crocs called this sandal the
2   Women's Swiftwater Sandal. Crocs has promoted and sold its Women's Swiftwater Sandals in
3   Nevada and throughout the United States, including in retail stores in Las Vegas.

4       33.    A comparison between Dawgs' Z Sandal (left) and Crocs' Women's Swiftwater
5   Sandal (right) is pictured below:



16       34.    Upon information and belief, in marketing its own Z-shaped Women's Swiftwater
17   Sandal, Crocs provides and promotes the Z-shaped appearance of the sandal upper. Through
18   these actions, not only has Crocs created a high likelihood of confusion between Dawgs' Z
19   Sandals and Crocs' sandals, but, upon information and belief, Crocs has created actual confusion
20   among actual or potential customers.

21       **C.**    **COMPUTER FRAUD.**

22           **1.**    **Zulily's website**.

23       35.    Zulily owns and operates a "flash sale" ecommerce website (www.zulily.com)
24   through which manufacturers or retailers, such as Crocs and Dawgs, seek to sell their products—
25   usually at a steep discount—for a short period of time ranging from a few hours to a few days. In
26   many instances, flash sale websites will advertise a particular product for sale in mass email
27   alerts allowing a recipient to click through the email to actually purchase the product remotely.
28   Flash sale websites incentivize consumers to buy now or lose the opportunity to buy the product



1  at a discount. For many manufacturers or retailers (who are considered "vendors" to the flash

2  sale entity) flash sale websites offer a means to quickly dispose of excess inventory.

3      36.    In Zulily's case, it will host a flash sale "event" for one of its vendors that will

4  typically span one to three days. Usually, a Zulily vendor will have only one sale event occurring

5  on a particular day. Upon information and belief, each day Zulily hosts hundreds of such discrete

6  sales events for its vendors. Zulily began operations in 2010, and it is believed that Crocs was an

7  early Zulily vendor. Dawgs began selling its products through Zulily's website in 2011.

8      37.    In order for a vendor to employ Zulily's flash sales services the vendor establishes

9  a private password protected portal hosted on Zulily's computer system. These private password

10 protected vendor portals are nearly the sole means of communication that may be supplemented

11 by email, between the vendor and Zulily about the vendor's products, timing and prices that will

12 be used for the vendor's sales event, and the results of sales event. Without doubt, this vendor

13 information contains highly confidential business trade secret information as it reveals much

14 about the vendor's ability to compete for consumers. Zulily itself recognizes the confidential

15 nature of the information it receives from vendors as its written vendor contract identifies this

16 information as being confidential and imposes on itself strict requirements to maintain it and it

17 includes procedures to advise vendors if the vendor's private portal or confidential information

18 has been compromised.

19     38.    Once the vendor creates a portal, the vendor electronically uploads images and

20 descriptions of the products it wishes to sell to Zulily (effectively on a consignment-type basis),

21 the price it is willing to sell its products to Zulily, the volume of products available per model,

22 and the sales "event". The sale of the product is, of course, conditioned on a Zulily consumer

23 buying the vendor's product, in this way Zulily does not typically acquire any vendor inventory,

24 and only buys sufficient products to meet its customer's actual demand. In that regard, Zulily

25 assesses the vendor's offer, and it occasionally makes counteroffers as to the vendor's prices and

26 timing of the sales event. Once Zulily and the vendor agree to sell a vendor's products, and the

27 parties agree on the prices Zulily will pay for the vendor's products, Zulily then adds a mark-up

28 for its costs and profit. The aforementioned communications between Zulily and the vendor

1 occur via the vendor's private password protected portal hosted on Zulily's computer system and

2 occasionally email is used for discrete matters.

3    39.    On the agreed upon date of the sales event, Zulily posts the vendor's products on

4 its website and when a product is purchased the vendor is notified and fulfills the purchase order

5 while Zulily processes the payment and tenders to the vendor its share of the sale. Zulily's

6 vendor portal maintains historical computer data for each of its vendors that provide the vendor

7 with the capability to fully assess its sales, sales strategies, consumer interest in its products, and

8 the ability to analyze that data in helpful ways. All of this computer data is highly confidential

9 business information for each vendor and if a vendor's competitor gained access to it, without

10 authorization, the competitor would have a grossly unfair—and illegal, if not criminal—

11 competitive advantage.

12    40.    Zulily is located in the state of Washington. Upon information and belief, Zulily's

13 computer system (including its servers) and/or networks, that hosts private password protected

14 vendor portals are not located in Nevada where Dawgs' computer system (and servers) are

15 located. Regardless, all communications between Dawgs and Zulily pertaining to Dawgs' sales

16 events on Zulily's website occur via interstate wires and explicitly involve interstate commerce.

17 Furthermore, all vendor sales conducted on Zulily's website also plainly effect interstate

18 commerce because any consumer in the United States can purchase any product (including

19 Dawgs' footwear) from Zulily's website. As such, both Zulily's and Dawgs' computer systems,

20 including Dawgs' private password protected vendor portal, are "protected computers" as

21 defined by 18 U.S.C. § 1030(e)(2)(B).

22    **2.    Defendants' unauthorized access of Dawgs' computer data**

23    41.    On March 22, 2016 Zulily produced a handful of emails to Dawgs in response to a

24 subpoena Dawgs served in the Colorado Action. A cursory review of the email communications

25 between Zulily and Crocs reveal that Crocs and Zulily had been engaging in years long

26 discussions about Dawgs and Crocs' efforts to stop Zulily from selling Dawgs' less expensive

27 competing products. Worse, for the first time Dawgs learned that Crocs employees gained

28 unauthorized access to Dawgs' highly confidential computer data contained within its private



password protected vendor portal hosted on Zulily's computer system.

42.　Defendant Lawrie is employed by Crocs as "Key Account Manager, eComm Channel", but prior to Crocs hiring her, Lawrie worked for Zulily as buyer of footwear. Upon information and belief, when Crocs hired Lawrie in 2013 she was no longer authorized to have any access to Zulily's computer systems including vendor portals hosted on Zulily's computer systems. Upon information and belief, Lawrie's experience working for Zulily provided her with unique insight into how the Zulily vendor portals operated and/or how information may be obtained from Zulily's vendor portals through non-public (or not readily public) means.

43.　In early November 2016, Dawgs used its password protected vendor portal to communicate with Zulily and the parties agreed that Zulily would host a sales event for Dawgs' products to commence on November 9 and run for three days.

44.　At 7:34 a.m. (PT) on November 8, 2016, Lawrie wrote to Zulily and said "During my audits I noticed that [Crocs is] on the new tomorrow [webpage] as well as Dawgs going live. They have an assortment of Crocs knock offs **loaded into the event**...We talked about making sure the events were completely separated or at least no crossover for clogs. Can you have them **pull all crossover**??? Help." Ex. 1 at Zulily002 (emphasis added). Zulily's Account Manager, Kim Klapperich, responded saying she was "going to find out if the DAWGS [sic] event is just the knock off UGG – softlined booties or knock offs of Croc's [sic] as well." *Id*. Within moments, Lawrie responded "**I can actually <u>get into their event</u>**. It's sheepskin boots and molded clogs. Let me know what you find out." *Id*. at Zulily001-002 (emphasis added).

45.　Internally, a Zulily employee said to another Zulily employee that Zulily had to remove any Dawgs products from Dawgs' November 9, 2016 sales event that were "crocs knock offs" because Zulily's sales of Dawgs' products was a "[b]ig pain point for crocs." *Id*. at Zulily003. Shortly thereafter, Klapperich responded "More good news – Just heard from the Footwear [Merchandising Manager]. [A Zulily employee] will remove the 15 items that are Crocs knockoffs [sic]." *Id*. at Zulily001

46.　On November 8, 2016, Zulily notified Dawgs that it would not sell Dawgs' lesser expensive molded clog footwear products that directly compete with Crocs.



47.     On November 8, 2016, the computer information contained within Dawgs' vendor portal and/or Zulily's computer system regarding Dawgs' impending sales event for November 9, 2016, and which Lawrie obtained, was not available or readily available to the public. At the time, Lawrie was not employed by either Zulily or Dawgs and, upon information and belief, neither entity authorized her to directly or indirectly access or obtain any of Dawgs' information stored on its vendor portal. The only way that Lawrie could "get into Dawgs' event" would have been by unlawfully obtaining or accessing without authorization Zulily's computer system and/or Dawgs' vendor portal.

48.     Upon information and belief, on November 8, 2016, Lawrie unlawfully employed dishonest means, false pretenses, and/or confidential information she learned while employed at Zulily to obtain or access without authorization Dawgs' non-public highly confidential computer data regarding, *inter alia*, its sales event scheduled for November 9, 2016, Dawgs' historical sales data, and Dawgs' proposed product specific sale prices for upcoming sales events.

49.     Lawrie intentionally included Crocs senior executives, Gray and Rufer, on her November 8, 2016 emails while she was, upon information and belief, in the process of accessing Dawgs' vendor portal and disclosing to Crocs, Gray and Rufer information she learned from Dawgs' vendor portal. Upon information and belief, the Defendants each knew or should have known that it was illegal, and indeed a criminal offense, for Lawrie to access without authorization Dawgs' non-public computer data hosted on Zulily's vendor portal. Upon information an belief, Crocs, Gray and Rufer, willfully and intentionally authorized or ratified Lawrie's actions described herein by, among other things: (i) not stopping her illegal intrusion into Zulily's computer system and/or Dawgs' vendor portal while it was ongoing, (ii) affirmatively authorizing Lawrie's unlawful conduct, (iii) concealing Lawrie's unlawful conduct, (iv) not reprimanding Lawrie, (v) not terminating Lawrie's employment, and/or (vi) by knowingly allowing Crocs to accept the financial benefits of denying Dawgs' access to Zulily's Internet services.

50.     Just a few weeks later in November 2016, Dawgs, like every other merchant in America, was eagerly anticipating the Thanksgiving "Black Friday" weekend shopping spree.

Zulily and Dawgs had agreed to a substantial event for Dawgs to sell its products over a four-day period. Without explanation, Zulily "dissolved" the event for Dawgs while, upon information and belief, allowing Crocs to sell its more expensive competing products during that lucrative period. Upon information and belief, Defendants again secured access to, or obtained information from, Dawgs' vendor portal and used that information to deny Dawgs access to Zulily's website and to cancel Dawgs impending sales event.

51.     As previously noted, Dawgs and Crocs are fierce competitors who are well known to one another. Indeed, at the time of Defendants' unlawful activities regarding Dawgs' vendor portal, Dawgs and Crocs were engaged in hotly contested litigation in multiple fora, including the Colorado Action. It is for this reason that Defendants' November 8, 2016 emails targeted Dawgs solely and specifically for removal from Zulily's website. Defendants each knew or should have known that Dawgs is a Nevada corporation and that Dawgs' data contained within its vendor portal belonged to Dawgs and that by accessing, obtaining, taking, using, or manipulating it without Dawgs' authorization would injure Dawgs in Nevada.

52.     During November 2016, Dawgs lost tens of thousands in revenue as a result of its denial of service to sell its products on Zulily's website.

53.     Upon discovering the above events Dawgs' counsel contacted Zulily to ascertain if Crocs' ability to "get into Dawgs' event" was in fact an unauthorized intrusion into Dawgs' password protected vendor portal. Zulily's counsel stated that no unauthorized access of Dawgs' vendor portal occurred, but Zulily steadfastly refused to provide any evidence to substantiate its claim. For example, on at least seven occasions (April 22 (letter), April 28 (email), May 3 (teleconference), May 3 (email following teleconference), May 8 (email), May 9 (letter), and May 30 (letter)) Dawgs sought verification that Defendants' November 8, 2016 access of Dawgs' "event" was lawful, but Zulily refused to provide any such evidence. Zulily specifically and repeatedly refused to disclose to Dawgs its computer logs for Dawgs' vendor portal that would identify who, when, and how Dawgs' password protected portal was accessed on November 8.

54.     In the end, Dawgs asked Zulily how Crocs **actually** got "into Dawgs' event"

and/or obtained information regarding Dawgs' November 9, 2016 sales event, but Zulily refused to provide any verifiable—or even reasonably conceivable—means as to how Lawrie lawfully accessed or obtained Dawgs' highly confidential computer data Zulily hosted.

55.     For the avoidance of doubt, at no time did Dawgs authorize any of the Defendants (or any third party) to access its highly confidential business information hosted on its Zulily's vendor portal. Dawgs did not disclose its Zulily vendor portal password to any third party. Dawgs used commercially reasonable means to ensure that its highly confidential business information hosted on its private password protected vendor portal remained confidential and not disclosed to the public. Nor did Dawgs authorize Zulily to disclose Dawgs' highly confidential business information with any third parties, most especially its competitor, Crocs. Indeed, Dawgs provided its confidential business data to Zulily pursuant to Zulily's vendor contract in which Zulily promised to secure Dawgs' confidential business information from unauthorized access to third parties.

56.     Upon discovering Defendants' unauthorized access of Dawgs' password protected computer data, and in addition to its lost revenues, Dawgs incurred more than $5,000 in damages in investigating and responding to this unauthorized intrusion, performing a damage assessment, including costs such as computer technical evaluations, identifying the perpetrators, and other costs directly required to respond to Defendants' misconduct.

## VI.     CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### TRADE DRESS INFRINGEMENT
(Against Crocs)

57.     Dawgs realleges and incorporates each and every previous paragraph of this Complaint as though fully set forth herein.

58.     As set forth and pictured above, Dawgs developed a unique sandal with a Z-shaped upper configuration, which Dawgs has been promoting and selling in the U.S. since 2007. The inclusion of the unique Z-shaped upper on a sandal in the appearance of Dawgs' Z Sandals, is inherently distinctive. Further, through its successful commercialization in Dawgs' Z Sandal,



the appearance of Dawgs' Z Sandals, including the Z-shaped upper configuration on a sandal, has become distinctive through secondary meaning.

59.     The intentional copying of Dawgs' Z Sandal by Crocs and Crocs' promotion and sale of a sandal with a Z-shaped upper, including its "Women's Swiftwater Sandal," has created a likelihood of confusion among consumers as to the source of the competing products. Among other things, Crocs' copying of the Dawgs' Z Sandal to create a sandal of similar overall image and appearance, has created actual and potential confusion among retailers and consumers.

60.     Crocs' conduct constitutes infringement of Dawgs' trade dress rights under 15 U.S.C. § 1125(a).

61.     Dawgs' business has been negatively affected by Crocs' trade dress infringement. The injuries to Dawgs caused by reason of Crocs' illegal acts include, but are not limited to lost sales and profits, damage to Dawgs' reputation and goodwill, disruption of Dawgs' business, legal fees and costs in attempting to stop Crocs' bad acts (including the filing of this action) and attempting to restore Dawgs' reputation and commercial viability in the marketplace.

62.     Further, these injuries to Dawgs were a direct, proximate, and reasonably foreseeable result of Crocs' violation of Dawgs' trade dress rights.  Dawgs has been and will continue to be injured in its business and property in an amount to be proven at trial.

63.     If Crocs' conduct is not halted, Dawgs will suffer irreparable harm to its trade dress and overall business. Crocs continues to sell footwear with Dawgs' trade dress, and there is no indication that it will stop in the future.  Remedies at law, including monetary damages, are inadequate to cure the harm to Dawgs. Dawgs is entitled to an injunction that prevents Crocs from causing any further confusion and diminution of Dawgs' position in the marketplace and triggering further future harm to Dawgs' business and reputation.

## SECOND CLAIM FOR RELIEF

## DECEPTIVE TRADE PRACTICES (TRADE DRESS)

### (Against Crocs)

64.     Dawgs realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.



65.     Crocs' actions – including its intentional copying of Dawgs' Z Sandal, its use of the good reputation and commercial success of Dawgs' Z Sandal by marketing and selling its copied Women's Swiftwater Sandals which, like Dawgs' Z Sandal, have the appearance of a sandal with a Z-shaped upper in similar markets through similar channels – constitute violations of the Nevada Deceptive Trade Practices Act, N.R.S. 598 *et seq.*, including NRS 598.0915.

66.     Dawgs' business has been negatively affected by Crocs' violations of the Nevada Deceptive Trade Practices Act. The injuries to Dawgs caused by reason of Crocs' illegal acts include, but are not limited to lost sales and profits, damage to Dawgs' reputation and goodwill, disruption to Dawgs' business, legal fees and costs in attempting to stop Crocs' bad acts (including the filing of this action) and attempting to restore Dawgs' reputation and commercial viability in the marketplace.

67.     Further, these injuries to Dawgs were a direct, proximate, and reasonably foreseeable result of Defendants' violations of the Nevada Deceptive Trade Practices Act. Dawgs has been and will continue to be injured in its business and property in an amount to be proven at trial.

68.     Pursuant to NRS 598A.210, Dawgs is entitled to recover treble damages plus costs and attorneys' fees from Defendants.

69.     Dawgs is also entitled to injunctive relief pursuant to NRS 598A.210, including a permanent injunction that prevents Defendants from continuing their conduct.

### THIRD CLAIM FOR RELIEF

### COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(a)(2)(C), (a)(4) & (a)(5))

(Against All Defendants)

70.     Dawgs realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

71.     Pursuant to 18 U.SC. § 1030 (g) Dawgs has a private right of action to civilly enforce the criminal statute entitled, Computer Fraud and Abuse Act, promulgated at 18 U.S.C. § 1030 *et seq*. ("CFAA").

72.     Zulily's computer system that hosted Dawgs' private password protected vendor

portal was a protected computer, system, or network, as defined by 18 U.S.C. § 1030(e)(2)(B), because those computer systems were used for interstate commerce. Each Defendant knew at the time that Lawrie obtained or accessed Dawgs' information on Zulily's computer system and/or Dawgs' vendor portal, the computers, systems or networks were protected computers engaged in interstate commerce.

73.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing Zulily's computer system and/or Dawgs' vendor portal, without authorization, and by obtaining information, including Dawgs' highly confidential business information.

74.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), by knowingly and with the intent to defraud Dawgs, accessing Zulily's computer system and/or Dawgs' vendor portal, without authorization, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to Dawgs' highly confidential business information.

75.     Defendants' intent to defraud, *i.e.*, Lawrie's wrongdoing, is evidenced by her engaging in dishonest methods, false pretenses, and/or using confidential information Lawrie learned while employed by Zulily to obtain Dawgs' non-public (or not readily public) information without authorization from either Zulily or Dawgs.

76.     Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A) and (B), by intentionally accessing Zulily's computer system and/or Dawgs' vendor portal, without authorization, and causing damage to Dawgs, recklessly or actually.

77.     Lawrie is personally liable for her unlawful actions in violating the CFAA, as described herein and because her unlawful conduct exceeded the scope of her duties as a Crocs employee.

78.     Defendants Gray and Rufer are personally liable for Lawrie's violation(s) of the CFAA, as described herein, because Gray and Rufer authorized, ratified, or directed Lawrie actions and Lawrie's unlawful conduct exceeded the scope of her duties as a Crocs employee.

79.     Within the twelve-month period from when Dawgs first discovered Defendants'



violation of the Computer Fraud and Abuse Act, Dawgs suffered an aggregate loss of greater than $5,000, in an amount to be proven at trial. Dawgs losses resulted from investigating and responding to the unauthorized intrusion of its computer data, performing a damage assessment, including costs such as, computer technical evaluations, identifying the perpetrators, and other costs directly required to respond to Defendants' misconduct. In addition to those injuries, Dawgs suffered tens of thousands in lost revenue as a result of a denial of service.

### FOURTH CLAIM FOR RELIEF

### UNLAWFUL ACTS REGARDING COMPUTERS (NRS 205.4765)

(Against All Defendants)

80.     Dawgs realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

81.     Pursuant to NRS 205.511 Dawgs has a private right of action to civilly enforce the criminal statute entitled, Unlawful Acts Regarding Computers and Information Services, promulgated at NRS 205.473 *et seq*.

82.     Defendants have violated NRS 205.4765(1) by knowingly, willfully and without authorization disclosing, using, transferring, taking, retaining possession of, coping, obtaining or attempting to obtain access to data, programs, and supporting documents, which exist inside or outside a computer, system or network, including Dawgs' confidential business information that existed inside Zulily's computer system and/or Dawgs' vendor portal.

83.     Defendants have violated NRS 205.4765(2) by knowingly, willfully and without authorization using, taking, damaging, transferring, coping, retaining possession of, or obtaining or attempting to obtain access to equipment or supplies that are used or intended to be used in a computer, system or network, including Dawgs' computers and/or Dawgs' confidential information that existed inside Zulily's computer system and/or Dawgs' vendor portal.

84.     Defendants have violated NRS 205.4765(3) by knowingly, willfully and without authorization taking, transferring, disclosing, coping, using, retaining possession of, or obtaining or attempting to obtain access to a computer, system or network, including Zulily's computer system and/or Dawgs' vendor portal.



85.     Defendants have violated NRS 205.4765(4) by knowingly, willfully and without authorization obtaining and disclosing, publishing, transferring, or using, a device including Defendants' computers and/or iPhone to access Dawgs' confidential business information that existed inside Zulily's computer system and/or Dawgs' vendor portal.

86.     Dawgs suffered an aggregate injury of greater than $500. In fact, Dawgs injuries resulting from investigating and responding to this unauthorized intrusion of its computer data, a damage assessment, including costs such as computer technical evaluations, identifying the perpetrators, lost revenue, and other costs directly required to respond to Defendants' misconduct, exceed $75,000 in an amount to be proven at trial.

87.     Lawrie is personally liable for her unlawful actions in violating NRS 205.473 *et seq.*, as described herein, because her unlawful conduct exceeded the scope of her duties as a Crocs employee.

88.     Defendants Gray and Rufer are personally liable for Lawrie's unlawful actions in violating NRS 205.473 *et seq.*, as described herein, because Gray and Rufer authorized, ratified, or directed Lawrie actions and Lawrie's unlawful conduct exceeded the scope of her duties as a Crocs employee.

89.     As a result of Defendants' violation of this statute Dawgs is entitled to punitive damages, costs, and attorneys' fees. NRS 205.511(1)(b) and (c).

## FIFTH CLAIM FOR RELIEF

## CIVIL CONSPIRACY

(Against All Defendants)

90.     Dawgs realleges and incorporates each and every foregoing paragraph of this Complaint as though fully set forth herein.

91.     On or about November 2016, Defendants Crocs, Lawrie, Gray and Rufer each agreed with each of the other Defendants to employ unlawful means to obtain Dawgs' password protected non-public (or not readily public) confidential information and in fact knew, authorized, directed, ratified, or approved Lawrie in using dishonest methods, false pretenses, and/or confidential information Lawrie learned while employed by Zulily, to actually and



1  unlawfully obtain Dawgs' secret information without authorization from either Zulily or Dawgs.

2      92.    Defendants' actions caused an actual injury to Dawgs in an amount to be proven

3  at trial.

4      93.    In light of Defendants' oppression, fraud, or malice, express or implied, Plaintiff

5  seeks an award of punitive or exemplary damages according to proof at trial.

6                          **SIXTH CLAIM FOR RELIEF**

7                   **RESPONDEAT SUPERIOR (N.R.S. 41.745)**

8                              (Against Crocs)

9      94.    Dawgs realleges and incorporates each and every foregoing paragraph of this

10 Complaint as though fully set forth herein.

11     95.    Crocs is vicariously liable for the torts of its employees Lawrie, Gray and Rufer.

12     96.    Defendants Lawrie, Gray and Rufer's actions in unlawfully obtaining or accessing

13 Dawgs' confidential business information that existed inside Zulily's computer system and/or

14 Dawgs' vendor portal was not an independent venture of Defendants Lawrie, Gray and Rufer, as

15 they held themselves out to Zulily as being Crocs employees and working within the scope of

16 their employment.

17     97.    Defendants Lawrie, Gray and Rufer's conduct in unlawfully obtaining or

18 accessing Dawgs' confidential business information was committed in the course of their work.

19 Indeed, Lawrie included her superiors, Gray and Rufer, in the email communications while she

20 was engaged in perpetrating the computer fraud offenses described herein, each of whom ratified

21 either explicitly or implicitly that Lawrie was acting within the scope of her employment with

22 Crocs as described herein by, among other things, not repudiating or halting Lawrie's November

23 8, 2016 email communications.

24     98.    Defendants Lawrie's, Gray's and Rufer's conduct in unlawfully obtaining Dawgs'

25 confidential business information was reasonably foreseeable based on Lawrie's prior

26 employment with Zulily and the fact that Crocs and its senior executives were advised of

27 Lawrie's unlawful accessing or obtaining Dawgs' confidential business information while

28 Lawrie was actually engaged in unlawful means to obtain Dawgs' information.



99.     Defendants' actions actually caused Dawgs injury in an amount to be proven at trial.

100.    Punitive damages are recoverable against Crocs for its vicarious liability of its employees because: (i) Crocs had advanced knowledge that Defendants Lawrie, Gray and/or Rufer were unfit for the purposes of their employment and employed them with a conscious disregard of the rights of others; (ii) Crocs expressly authorized, approved or ratified Lawrie's unlawful actions; (iii) Gray and/or Rufer did expressly authorize or ratify Lawrie's wrongful acts for which damages are sought against Crocs; or (iv) Crocs is guilty of oppression, fraud or malice, express or implied. Furthermore, upon information and belief, Crocs managers including, but not limited to Gray and Rufer, were expressly authorized to direct or ratify the conduct of Lawrie, Gray and Rufer, on behalf of Crocs.

## **PRAYER FOR RELIEF**

WHEREFORE, Dawgs respectfully requests that judgment be entered in their favor and pray that the Court grant the following relief:

i.      Judgment in favor of Dawgs on each claim for relief against Defendants;

ii.     An award of damages to Dawgs, including at least all profits from Crocs' sale of footwear with the infringing trade dress, such as Crocs' Women's Swiftwater Sandal;

iii.    Treble, exemplary, and/or punitive damages as permitted by applicable law;

iv.     Attorneys' fees and costs as provided for by applicable federal and state statutes;

v.      Pre-judgment interest on any amount awarded to Dawgs;

vi.     Post-judgment interest on any amount awarded to Dawgs;

vii.    A permanent injunction barring Crocs from (a) making, promoting, or selling its Women's Swiftwater Sandal, (b) otherwise infringing Dawgs' trade dress and (c) otherwise violating the Nevada Deceptive Trade Practices Act; and

viii.   All other legal and equitable relief as the Court deems just and proper.

/ / /

/ / /

/ / /

**JURY DEMAND**

A trial by jury is demanded on all issues triable to a jury in this case.

DATED this 27th day of July 2017.

DICKINSON WRIGHT PLLC

_____

JOEL Z. SCHWARZ
(Nevada Bar No. 9181)
Email: jschwarz@dickinsonwright.com
JOANNA M. MYERS
(Nevada Bar No. 12048)
Email: jmyers@dickinsonwright.com
8363 West Sunset Road, Suite 200
Las Vegas, NV 89113
Telephone: 702-550-4440
Fax: 702-382-1661

**HELLMICH LAW GROUP, PC**

CHRISTOPHER HELLMICH
(application pro hac vice pending)
Email: chellmich@hellmichlaw.com
5753-G E. Santa Ana Canyon Rd. #512
Anaheim Hills, CA 92807
Telephone: 949-287-5708
Fax: 714-974-7733

*Attorneys for Plaintiff U.S.A. DAWGS, Inc.*

